Good morning, Your Honor. My name is Robert Muller, and I'm counsel for Petitioner Edward Martirissian. And I'd like to begin this by saying, since I've briefed, I think, fairly extensively the facts of the case, I'd like to direct the Court's attention to the core legal issue, which I believe decides the matter before you and requires remand back to the Court in Zeng v. INS. In fact, I'd also like to bring to this Court's attention the Second Circuit opinion in Kuzman v. Ashcroft, which has just recently been reported, which has followed this Court's decision in Zeng. And the site for that case is 2004 U.S. F. Lexis 3621. Excuse me. And that decision was rendered just this past February and amended in March. And you provide counsel with the citation for that case? Sure. That's 2004. Have you before now? Yes. Oh, good. Yes. All right. Do you want a citation? It's Kuzman, K-H-O-U-Z-A-M, v. Ashcroft. And it's cited as 2004 U.S. F. Lexis 3621. You're welcome. Your Honors, in the Court's decision in Zeng, the Court said that the determination of how to define torture is left to Congress and that torture, for the purpose of defining torture, acquiescence requires merely that the government turned a blind eye to the torture that's being inflicted by the individuals. It's clear when you look back in the record here, since the Convention Against Torture was fairly new at the time that the immigration judge and the BIA was deciding this case, they did not apply the standard articulated in Zeng. Rather, they applied a standard to those facts which required something more than mere blind, willful blindness or a blind eye. They required something, as the Department of Homeland Security says in their brief here, that there's some deliberate acceptance or something more than a mere blind eye. Well, this Court rejected the cases relied upon by the BIA and the Department of Homeland The decision in Aguiar, which says that you should look to the government to make a determination as to how to define torture and acquiescence. This Court said no. This Court said that when Congress is clear as to what torture means, you look to what Congress intended, and Congress intended acquiescence to mean not what the government was applying and responded was Because the definition of torture was used in the determination of this case, this Court should remand the case back to the BIA for a determination of the facts. In fact, this Court has said in Zeng that the BIA should be the party to determine in the first instance applying the right standard, and that's the citing to the U.S. Supreme Court's decision in INS v. Ventura. So based thereon, we request that the matter be remanded down to the BIA. I'd also like to point out to the Court that the respondent's attempt to use motive to somehow bootstrap their use of acquiescence doesn't work here. Motive is irrelevant, as I pointed out in my brief. Motive is irrelevant for the purposes of what the government officials were acting with a blind eye. It doesn't matter what the government officials were intending in their own mind. What matters, according to Congress, is that they were turning a blind eye and they were aware of the torture. The same goes for with respect to the motive is irrelevant with respect to the acts taken by the perpetrators here, because it's clearly shown that they were acting with a bad motive, and the Convention Against Torture is very broad. Discrimination of any type will do. Don't you have to demonstrate that it's more likely than not that your client will be tortured if returned to the country in question? Yes, we do, Your Honor. It's not enough to show that he may have been tortured in the past, is it? Well, Your Honor, the Convention Against Torture says that evidence of past torture can be evidence of that an individual will more likely than not be tortured in the future. I know. The key question is whether it's more likely than not that he will be tortured if returned. That's the key question for... It seems here the I.J. concluded that's not the case, because there's a large time lag between the incidents that are in the record, and also that the group lost its power in 1993 with the advent of a new government. There are at least two other governments beyond that time. There's no showing that the government of Georgia is interested in Armenians or wishes to hurt them or kill them. So the I.J. seems to have confronted the idea that there may have been problems in the past, but there's a failure of proof on whether it's more likely than not that he'll be injured if he goes back. Your Honor, two points. One is, that's a determination not for this Court, but for the BIA. And the decision, the language you just read is exactly the language which we're complaining about here. That's the wrong standard. For example, it doesn't matter whether or not the government is interested in torturing or participating in this. All that matters is, did the government turn a blind eye? Were they willfully blind? Well, that's the past. That's what I'm trying to get at. That's the past. Yes. There may have been. The other side, is it possible that the other side can stand up and say, yeah, he was tortured 20 years ago. And since then, conditions have so changed that there's no reasonable possibility at all that if returned, he'll be tortured again. Well, the evidence in the record, Your Honor, on balance doesn't show that conditions have so changed. Really, what the Court is relying upon was the testimony of Petitioner. And if you read the transcript of the hearing, there is a fairly lengthy examination of the Petitioner and a fairly short cross-examination of the Petitioner. And the immigration judge's decision focuses in on this family dispute issue and really doesn't get to the evidence about whether the country conditions have changed in detail. Well, the agency says there have been two new governments since that time. That's irrelevant? Well, it's not irrelevant, Your Honor. But what the immigration judge has ignored in his decision was the evidence put forward by the Petitioner as to the country conditions at the time.  What do you mean by ignored? There's no reference in the immigration judge's decision as to the evidence put forward by Petitioner as to the country conditions, the newspaper articles, for example. So where does the evidence come from? The evidence comes from, primarily, Petitioner's own testimony. The evidence could come from the government. In fact... But does it matter where it comes from, if it's in the record? Well... I mean, the IJ can rely on it wherever it comes from in the record, correct? That's correct, Your Honor. But it's our position that the record was not examined adequately, primarily... We hear this all the time, and it's... The IJ has always said, we've considered the record, but if they don't leave, if they leave something out, then lawyers try to tell us, well, they didn't consider that, even though they did. But here I said, they mistreated him and stole his ambulance, but that was nine years ago. The respondent admits that he has a blanket of nine years around him. He lived in that country without incident, except through his brother-in-law, who's angry at him. So, he's saying, this is ten years ago, there have been two intervening governments. The head re-owned has now been disbanded. And you say that's not enough to support the IJ's conclusion that it's not more likely... What I'm saying, first of all, Your Honor, is that's not a matter for this Court to consider. That's a matter for the BIA to consider, because the BIA... I don't understand what you mean when you say that. I mean, you've brought a petition for review, and now we're reviewing. We're looking at the evidence and what the IJ said, and why is this a matter for us to review? I don't understand that. Because Zeng says that when a lower court has applied the wrong standard here, the definition of tort and acquiescence, you don't even reach the evidence. You don't reach it. You don't make a determination whether there's substantial evidence here. That assumes that the wrong standard was used. Do you have a minute left? Do you want to save it for rebuttal? Yes, I would, Your Honor. All right. Thank you.   Thank you. I'll take the other side. Good morning, Your Honors. Thomas Ragland for the Respondent, John Ashcroft. Your Honors, the evidence in this case simply does not compel this Court to reverse the reasoned decision of the Board of Immigration Appeals that the petitioner failed to demonstrate a clear probability that he would face torture either by or with the consent or acquiescence of government officials if he were returned to Georgia. Is that the standard, clear probability, or more likely than not? Yes, Your Honor, it's a more likely than not. It's also described as clear probability. Is that the same thing? Yes, Your Honor. Okay. Well, what I hear from the other side is the problem with this case is that down below they used the wrong standard, they applied the wrong test, and that in and of itself requires us to send it back and say, do it over again and this time do it right. Did they use the wrong standard? Your Honor, I don't believe they did use the wrong standard. The government contends that the issue in this case is the Respondent's failure to meet his burden of proof, not that there was a misapplication of the legal standard and even granting the point that this Court made in Zhang that acquiescence can also mean willful blindness. Clearly that is the law in this circuit. Even granting the point in Zhang, we contend that the evidence that the Petitioner presented does not demonstrate that he would face future persecution. You concede he suffered past torture? The evidence, Your Honor, the evidence indicates that he was mistreated more than 11 years ago, severely mistreated more than 11 years ago, during a time in Georgia that by his own testimony was a period of great unrest. It was a time when the government of Sviatom Sikurdia had been ousted in a coup. For a period there was no president in the country and these individuals who he describes as the hedrioni took it upon themselves to act as sort of the de facto authorities. They put on uniforms, they took up their guns, they went in the streets and instituted roadblocks, and they were motivated partly also by ethnic animosity. Since that time, 11 years have passed, there have been significant changes. The country reports from 2000, which are in the record under the ethnic minorities section, do not indicate that there is currently persecution or torture inflicted by the government. There is no persecution or torture of persons of Armenian descent? They do not state that currently there is no persecution, but in that section they do not refer to persecution or torture of Armenian ethnics in Georgia today. Furthermore, Your Honor, the evidence record that the petitioner has provided is not specific enough, we contend is not specific enough to meet the standard that this court operates under, which is this court must be compelled to find that the board's determination is not one that a reasoned fact finder should have breached based on the evidence it considered. It is a substantial evidence standard, as the court stated in Zhang, and the government's contention is that the petitioner's testimony does not rise to that level to show that if he were returned to Georgia today, he would face a clear probability of being tortured. You say that the hedrione is no longer a problem because it's been absorbed by the regular government and it's disappeared. The other side says that's exactly why it's a worse problem, because the people responsible for this torture here now aren't out there as a rogue group, they are part of the government. How are we supposed to contend with that? Well, Your Honor, the petitioner's testimony, when he was asked specifically about his allegation that the hedrione now are part of the government, his assertion was, well, my brother-in-law is a police investigator, and what about the other hedrione members? He named no other individuals who were former hedrione members who had become part of the government. With respect to his brother-in-law, he testified when asked why would his brother-in-law be after him, that the brother-in-law and the family have all opposed him since he married their sister because he is part Armenian, that they specifically objected to the marriage and felt like he was a disgrace to the family. The evidence that he's presented does not name any individuals who have moved from the hedrione into the government other than his brother-in-law. At the time when the police abused him, according to his testimony, during that period, he testified that the police were acting in fear of the hedrione, that there were officers who would not even wear their uniforms during that time because they were afraid of the hedrione, which was sort of the de facto authority at the time. It did strike me that he was afraid of the hedrione. They stole his ambulance, and that started this avalanche of problems. Yet he didn't seem to be afraid enough that he didn't steal the ambulance back from them. I mean, if a monstrosity group like this stole something from me, I doubt that I'd be interested in stealing it back. It's just an atmospheric that caused me to stop and think. Yes, Your Honor. Anyway, what else do you have to tell us? Well, Your Honor, looking at the totality of the record in this case is also informative. The petitioner arrived in this country in September of 93. He filed an asylum application in November of 93 in which he alleged generalized discrimination. He described his activities in Armenia where he was part of a group called the Armenian Revolutionary Front. He described being arrested and imprisoned in Armenia, and that was the basis of his asylum claim initially. That claim was denied. He renewed his 589 again. He appealed to the board. He had a number of motions. And it was reopened? It was reopened. Actually, he filed a motion to reopen with additional evidence. That motion was denied. Eventually, when the torture convention regulations were passed, after he had already received a final order of deportation, the case was reopened. It was not until six years after proceedings began in this case that he first alleged that he had been tortured or that he'd suffered any mistreatment beyond his ambulance having been stolen and his brother disliking him. The allegations of the beatings, of the home invasion, of the beatings by the police all for the board and the judge. What does that mean? Are we supposed to believe they're not true? No. I'm not suggesting that his testimony was, because neither the judge nor the board found that he was not credible. Right. There's no adverse credibility. That's correct, Your Honor. What the government is contending is that he has not provided sufficient evidence, sufficient proof, compelling, specific, detailed testimony that would meet the standard of a clear probability that he would be tortured if he were returned or that would compel this court to reverse the reasoned decision of the administrative agency below. Do you have anything else? I think that concludes my statement, Your Honor. Thank you, counsel. Thank you very much. You could help me by once again telling me why it is that you believe that the wrong standard was used by the IJ and the BIA. Because when you read the immigration judge's decision and the BIA adopts that decision, the very language where you can see the immigration judge really getting, it's an oral decision put on the record, the immigration judge really getting to the nexus and the point of his judgment, he says, look, maybe 1,000 years from now there will be conflicts, but whether or not the government was systematically or in any way physically or mentally abusing this person for whatever reason has not been shown to me to this day. And what's missing? The government need not systematically torture someone, it just need merely turn a blind eye. Acquiesce? Acquiesce. All right. So let's jump up to the beginning of that paragraph. The respondent has not shown that it is more likely than not that he would be injured in any way if he were to return to Georgia. He has not shown he would be injured physically or mentally if he were to return to Georgia by the government or by groups that the government factions or a group whose action the government would acquiesce in. I read that as the blind eye language. Yes, but he says it right there. But you cannot stop at that point, Your Honor. You have to jump to the next part of the opinion because it's what was the concept of acquiescence in this judge's mind when they were pending this decision? And since Zeng had not been decided yet, since this issue had not come up before the courts, and since the parties were clearly relying upon things like matter of S.V. interim decision, which is still being cited by the government in their briefs, clearly the court back then was not using the definition of acquiescence that is now being used today. But acquiescence in and of itself has a meaning alone apart from systematically torturing. I mean, it's different. That's correct, Your Honor. And that's our position, that acquiescence is something just turning your back, turning a blind eye while knowing that it is going on. And it's our contention that the immigration judge, nor the BIA, was using the correct standard, which has now been articulated by this circuit, followed by the Second Circuit at that time. So when you read the opinion as a whole, you can only come away with one conclusion. The wrong standard was used. Thank you, counsel. Thank you, Your Honor. The case is taken under submission. We appreciate your help. We'll get you a decision as soon as we can. Thank you very much. Beto Silva v. Ashcroft is submitted on the briefs. We'll call United States v. Armando Diaz Rivera.
judges: Hall, Trott, Callahan